UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**REGINA MURRAY**,                                    Case No. 6:13-cv-01717-KI

             Plaintiff,                      OPINION AND ORDER

   v.

**COMMISSIONER OF SOCIAL
SECURITY**,

             Defendant.


     Richard F. McGinty
     McGinty & Belcher, Attorneys
     P.O. Box 97301
     Salem, OR 97301

          Attorney for Plaintiff


Page 1 - OPINION AND ORDER

S. Amanda Marshall
United States Attorney
District of Oregon
Ronald K. Silver
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97201-2902

      Attorneys for Defendant

KING, Judge:

      Plaintiff Regina Murray brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB"). I affirm

the decision of the Commissioner.

## BACKGROUND

      Murray filed an application for DIB on October 12, 2010, alleging disability beginning on

July 30, 2008.[1]  The application was denied initially and upon reconsideration. After a timely

request for a hearing, Murray, represented by counsel, appeared and testified before an

Administrative Law Judge ("ALJ") on April 4, 2012.

      On May 18, 2012, the ALJ issued a decision finding Murray not disabled within the

meaning of the Act and therefore not entitled to benefits. This decision became the final decision

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

September 3, 2013.

---

      [1]Murray's application for DIB reflects she became unable to work on June 25, 2010, but
the ALJ used the date Murray stopped working as her disability onset date. Tr. 20, 185.

Page 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance.  Id. (internal quotation omitted).  The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations.  Id.

## THE ALJ'S DECISION

The ALJ concluded Murray has the severe impairments of fibromyalgia, left shoulder

impairment, dysthymia, and panic disorder.  The ALJ found these impairments, either singly or

in combination, did not meet or medically equal the requirements of any of the impairments

listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  Murray has the residual functional capacity

("RFC"), according to the ALJ, to perform the full range of sedentary work but cannot frequently

reach overhead with her left dominant upper extremity.  Given this RFC, the ALJ determined

Murray could return to her past relevant work of accounting clerk, bookkeeper, and office

manager.

## FACTS

Murray was 52 years old at the time of her alleged onset date of disability.  She has her

GED, had completed one year of college, and had on-the-job training of approximately two years

in the area of accounting.  Murray has a solid work history, performing accounting services for

various companies over the years.  Sunwest Management was Murray's last employer, which laid

her off on June 30, 2008 after she had worked there for two and a half years.  Murray testified

that she called in sick approximately once a month, in the last six months of her employment,

due to pain, headaches, and fatigue.

Murray also testified that she attempted to find work after she was laid off, and that if she had been offered a position she would have been able to perform the duties of the job. Tr. 54. Nevertheless, she felt her condition was deteriorating in 2008, when she was still working, because she was fatigued and in pain.

Dr. Ginevra Liptan diagnosed Murray with fibromyalgia on April 13, 2011.[2] Murray sought treatment for shoulder pain on February 25, 2011, and reported it had been ongoing for approximately nine months. Dr. Jody Guyette evaluated Murray on December 4, 2010 and diagnosed dysthymia and panic disorder without agoraphobia.

## DISCUSSION

Murray challenges only the ALJ's treatment of the medical evidence. The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. Id. (treating physician); Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. Orn, 495 F.3d at 632; Widmark, 454 F.3d at 1066. The opinion of a

---

[2]Murray began discussing the possibility of fibromyalgia in June of 2010. Tr. 455. At that time, she was diagnosed with "myalgia and myositis." Tr. 456. She was referred to a fibromyalgia clinic in February 2011, and seen by Dr. Liptan, a rheumatologist, in April 2011.

nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  Widmark, 454 F.3d at 1066 n.2.

I.    Dr. Guyette's Opinion

The crux of Murray's appeal is the ALJ's treatment of Dr. Guyette's opinion.  Dr. Guyette performed a 50-minute evaluation of Murray on December 4, 2010.  At the evaluation, Murray reported that "her depression is primarily due to the pain issues that she suffers."  Tr. 535. Although she was not diagnosed with fibromyalgia until May 2010, Murray reported being in pain for the past 10 to 13 years.  She described pain in her left arm, right hip, ribs, and overall tenderness; she took Motrin on a daily basis but no other pain medications.  Murray also reported experiencing depression since February 1997.  Her episodes lasted 3 to 4 days where she cried, slept, and stayed in her robe all day.  Similarly, Murray reported experiencing panic attacks beginning in 1999.  She took Amitriptyline for depression and fibromyalgia[3] and Ranitidine for acid reflux.

Murray told Dr. Guyette that her typical day, depending on how she was feeling physically, started between 8 and 8:30 a.m.  She made coffee, went in the garage to smoke a cigarette and drink her coffee, and then washed her face.  Murray would then sit at the computer to check her e-mail, would do some stretches, and would talk to her sister around 10:00 a.m.  If it was a good day, her sister might come for a visit or they might shop together.  Murray needed help lifting items when she shopped for groceries, but she made her own lunch and performed

---

[3]She reported the amitriptyline was for depression and fibromyalgia.  Tr. 188.  Her doctor explained the amitriptyline was to help with her pain and to sleep.  Tr. 553.

some light housekeeping including laundry.  She spent time with her sister and brother-in-law

playing cards and games.

Dr. Guyette noticed some pain behavior, in that Murray had to stand up and stretch twice

during the interview.  Murray was polite and cooperative, and demonstrated no difficulty

answering questions.  Murray reported her mood was "fair" most days, and she appeared

"pleasant throughout the interview and her affect did not appear majorly depressed."  Tr. 538.

Dr. Guyette reported:

> The claimant's problem is treatable.  Her depression is primarily related to her
> pain issues.  She is not currently receiving any medication treatment for her
> depression.  She seems to be managing her panic disorder relatively well with
> relaxation exercises.  She still is able to maintain some appropriate, meaningful
> interpersonal relationships, although she does isolate during her "bad days."

Tr. 540.

> After performing her assessment, Dr. Guyette opined Murray
>
> does have the ability to perform simple and repetitive tasks as well as more
> detailed and complex tasks.  The claimant likely would have no difficulty
> interacting with coworkers or accepting direction from a boss.  The claimant
> would also be able to deal with the usual stress of a workplace.  *The claimant
> would have difficulty attending work on a regular basis and being consistent in
> her work attendance, primarily due to her pain issues.  As mentioned earlier, her
> depression primarily stems from those pain issues.*  Overall, the claimant's
> capacity is fair, with some mild to moderate impairment.

Tr. 540 (emphasis added).

The ALJ gave significant weight to the portion of Dr. Guyette's opinion finding Murray

could perform simple and detailed tasks and could get along with others, but only gave "some

weight" to the part finding Murray would have difficulty attending work on a regular basis.  The

ALJ explained:

Page 8 - OPINION AND ORDER

Although Dr. Guyette also noted that the claimant "would have difficulty attending work on a regular basis and being consistent in her work attendance," this limitation was "primarily due to her pain issues." I further note that earlier in the same interview, the claimant disclosed that she was not taking any pain medication at the time, except for some over-the-counter Motrin. At the hearing on April 4, 2012, the claimant stated that she is now taking Ga[b]apentin which helps ease the pain. I further note that just one month before Dr. Guyette's evaluation, the claimant stated in a Function Report on November 4, 2010 that she can put a "small load of laundry in the washer" and "start a little dinner preparations." When the longitudinal records are viewed together, the claimant's pain complaints do not reach the disabling level alleged. It is reasonable to then infer that the limitation on attendance and persistence, attributed to pain issues, is also not as disabling as alleged. This portion of Dr. Guyette's opinion is accorded some weight only.

Tr. 27.

Murray argues the ALJ's rejection of Dr. Guyette's opinion that she would have trouble attending work regularly is not supported by substantial evidence. Because Dr. Guyette's opinion is contradicted by the opinions of Dorothy Anderson, Ph.D., and Kordell Kennemer, Psy. D., both of whom believed Murray had no severe mental impairment at all, the ALJ was required to give specific and legitimate reasons for rejecting Dr. Guyette's opinion. Murray challenges the ALJ's: (1) reliance on Murray's use of new pain medication; (2) reliance on her laundry and dinner preparation activities; (3) interpretation of Dr. Guyette's functional limitations to be associated with Murray's pain; and (4) disingenuous use of the phrase "some weight."

I agree with Murray that the ALJ's assertion that she was giving "some weight" to that portion of Dr. Guyette's opinion about Murray's work attendance is inexplicable. In reality, the ALJ accepted part of Dr. Guyette's opinion and rejected part of it. Nevertheless, an ALJ need not use "magic words" in resolving conflicts in the medical record, and the reviewing court is permitted to draw reasonable inferences. Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir.

1989).  It is sufficiently apparent from the ALJ's opinion that she rejected the portion of Dr.

Guyette's opinion concluding Murray would have attendance problems.

I also agree with Murray that Dr. Guyette was aware of the extent of Murray's laundry

and cooking activities and that she must have considered these activities in identifying Murray's

functional limitations.  This was not a specific and legitimate reason for rejecting a portion of Dr.

Guyette's opinion.

Nevertheless, the ALJ correctly noted that Dr. Guyette concluded Murray would miss

work due to her pain issues.  It is also a fair reading of her opinion that Dr. Guyette believed

Murray's pain and depression were directly linked; thus, if it was depression that Dr. Guyette

believed would cause Murray's work attendance problems, then lessening Murray's pain would

also lessen the possibility of work attendance problems.  As the ALJ pointed out, at the time of

Dr. Guyette's evaluation Murray was not taking any pain medication, but she had started taking

Gabapentin by the time of the hearing.  Murray argues the Gabapentin only "eases" her pain, and

does not resolve it.  She also argues it is incorrect to rely on her new pain medication–discussed

at a hearing 16 months after the evaluation–to question Dr. Guyette's functional limitations.

Neither of Murray's arguments are persuasive.  First, with respect to Murray's

implication that there was a 16 month gap between the evaluation and her taking medication,

Murray was prescribed Gabapentin just five months after seeing Dr. Guyette.  As for her

testimony that the medication only eased her pain, there is no requirement that pain must be

eliminated.  Moreover, Murray told her doctor on August 25, 2011 that with the Gabapentin her

"rib problem" was "80% better" and she wanted to continue the medication.  Tr. 583.  Her doctor

noted Murray's fibromyalgia was "doing better on her meds esp gabapentin - pt to continue

meds." Id.  On November 11, 2011, she told her doctor that she "has had fatigue, some weakness in her legs and feet for a few hours–once–got into bed and warmed up and seemed to get better-no leg pains all the time - general fatigue noted - she is taking the gabapentin 300 TID still as recc by OHSU."  Tr. 588.  Thus, as the ALJ pointed out, "the longitudinal records" demonstrate Murray's "pain complaints do not reach the disabling level alleged.  It is reasonable to then infer that the limitation on attendance and persistence, attributed to pain issues, is also not as disabling as alleged."  Tr. 27.

Finally, with respect to Murray's suggestion that the ALJ cherry-picked Dr. Guyette's opinion, there is no evidence of this.  I have reviewed the record and there is no other evidence supporting Murray's need to miss more work than is acceptable to an employer, other than Murray's own testimony which the ALJ properly discredited.  Further, Murray's own testimony about her attendance when she worked, and before receiving treatment for any of her severe impairments, undermines the possibility of a work attendance problem.  Compare Tr. 39-40 (missed work once a month in last six months of employment) with Tr. 69 (vocational expert testimony that 1.5 days of absences per month is acceptable).  The ALJ properly discredited the part of Dr. Guyette's opinion concluding Murray would have work attendance problems.

II.    State Agency Psychological Consultants

Murray criticizes the ALJ's representation that she was giving "significant weight" to the opinions of Dr. Dorothy Anderson, Ph.D., and Dr. Kordell Kennemer, Psy. D., when neither considered Murray to have a severe mental impairment but when the ALJ herself assessed severe mental impairments.

Page 11 - OPINION AND ORDER

The ALJ gave the opinions "significant weight" to the extent that neither doctor found Murray limited by any mental impairments. The ALJ merely gave Murray the benefit of the doubt by assessing whether she had any functional limitations associated with her dysthymia and panic disorder. If the ALJ erred, it was harmless.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this ___3rd___ day of September, 2014.


__/s/ Garr M. King_____
Garr M. King
United States District Judge